IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 1:21-mj-136 |
| DOUGLAS CHARLES EATMON, | ) |
| | ) |
| *Defendant.* | ) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Edgar Gay, Task Force Officer of the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

### INTRODUCTION

1. I am a Detective with the Fairfax County Police Department. I have been employed as a police officer with the Fairfax County Police Department ("FCPD") since 1996. I have been assigned to the Vice/Narcotics Unit since 2000. I have been assigned to the Drug Enforcement Administration ("DEA") since 2006, where I am federally deputized as a Task Force Officer with the DEA's High Intensity Drug Trafficking Area Task Force located in Annandale, Virginia.

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3. I have investigated violations of federal and state narcotics laws. I have conducted and participated in numerous narcotics investigations resulting in the arrest and conviction of drug distributors and seizures of controlled substances. Many of these investigations have dealt with the distribution and use of cocaine, cocaine base (commonly known as "crack cocaine"), heroin, and

3,4-methylenedioxymethamphetamine ("MDMA"). I have received extensive training in drug identification, drug distribution methods, and drug enforcement techniques from both state and federal agencies. As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances, including cocaine, crack cocaine, heroin, and MDMA.

4. I have participated in the execution of more than one hundred search warrants and have sworn to numerous affidavits in support of arrest warrants and search warrants for illegal narcotics, paraphernalia related to the use of illegal narcotics, monies or proceeds derived from the sale of narcotics, and records, ledgers, and documents pertaining to the purchase and sale of controlled substances.

5. This affidavit is submitted in support of a criminal complaint charging DOUGLAS CHARLES EATMON with knowingly and intentionally conspiring to distribute 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

6. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers and agents involved in this investigation. All observations referenced below that were not personally made by me were related to me by the persons who made such observations.

7. Law enforcement officers have also used a cooperating source of information ("CS-1") during this investigation. Regardless of sex, I will use masculine pronouns to refer to CS-1. CS-1 has proven to be reliable and credible through his long-term use by law enforcement officers. CS-1 has provided information in the past that has proven to be truthful. The information that CS-1 has provided in this investigation has been corroborated through various investigative

techniques. CS-1 has a criminal history that includes convictions for concealing merchandise, uttering, obstruction of justice, assault, distribution of cocaine, possessing cocaine with intent to distribute, larceny, probation violation, aggravated malicious wounding, manufacture, sale, or possession of a controlled substance, and assault and battery of a family member. CS-1 does not have any pending state or federal criminal charges. CS-1 is being financially compensated for cooperating with law enforcement and for expenses incurred. CS-1's information concerning EATMON has been corroborated through physical surveillance, information obtained from various law enforcement and public databases, the investigation itself, and subpoenaed toll records. CS-1's information has never been found to be false or misleading. For these reasons, I consider CS-1 to be reliable.

8. This affidavit contains information necessary to support probable cause and is not intended to include each and every fact and matter observed by me or known to the United States.

## BACKGROUND

9. In and around January 2020, DEA and FCPD's Organized Crime and Narcotics Unit jointly launched an investigation into a drug trafficking organization ("DTO") operating in the Eastern District of Virginia. During this investigation, law enforcement developed considerable evidence that members of this DTO, including EATMON, Co-Conspirator 1 ("CC-1"), Co-Conspirator 2 ("CC-2"), Co-Conspirator 3 ("CC-3"), and others conspired to distribute 280 grams or more of cocaine base within the Eastern District of Virginia. The investigation also revealed that EATMON's criminal history includes federal felony convictions for possession with intent to distribute crack cocaine of at least 50 grams and possession of a firearm while trafficking narcotics.

10. In January 2020, law enforcement received information from CS-1 that CC-1 was distributing crack cocaine, powder cocaine, and heroin in Fairfax County, Stafford County, and

surrounding areas, all within the Eastern District of Virginia. CC-1 asked CS-1 if he knew anyone who wanted to purchase heroin, crack cocaine, or powder cocaine, indicating that CC-1 would sell to them.

11. CS-1 advised me that CC-1 had previously distributed heroin and cocaine at a job site located in Stafford County, Virginia, and that he had personally witnessed CC-1 meet with several drug customers and distribute narcotics to these customers.

12. Thereafter, CS-1 contacted CC-1 and advised him that he (CS-1) had a friend who wanted to purchase crack cocaine. CC-1 agreed to meet CS-1's friend. As a result, while posing as CS-1's friend in an undercover capacity, I spoke with CC-1 via cellular phone and arranged to purchase crack cocaine.

13. CS-1 advised that CC-1 re-distributes crack cocaine, powder cocaine, and heroin supplied by EATMON to customers within the Eastern District of Virginia. Investigation also revealed that EATMON was in contact with several cocaine customers and distributors in the Eastern District of Virginia.

### A. January 28, 2020 Attempted Purchase

14. On or about January 28, 2020, working in an undercover capacity, I contacted CC-1 regarding the purchase of two ounces (approximately 56 grams) of crack cocaine for $2,800.00. During this conversation, CC-1 advised that he would meet me at the Cinemark Centreville 12 in Centreville, Virginia, in the Eastern District of Virginia. Once I arrived at the location, I contacted CC-1 by cellular phone. CC-1 stated he had to meet his supplier before meeting me. CC-1 also asked me to meet him at a different location. Law enforcement subsequently learned that the new location was the same location at which CC-1 met his supplier, EATMON, prior to meeting me. That location was at Ravensworth Shopping Center in Springfield, Virginia, within the Eastern

District of Virginia. I advised CC-1 that I would meet him at the original scheduled meet location or nearby.

15. CC-1 contacted me and advised that he was near the agreed upon meet location. Eventually we decided to meet down the street from the Cinemark Centreville 12 parking lot at an Exxon gas station parking lot in Centreville, Virginia, within the Eastern District of Virginia. I arrived in the parking lot and parked near CC-1's vehicle. CC-1 then entered the front seat of my undercover vehicle. I had in my possession FCPD funds in the amount of $2,800.00. CC-1 then handed me the suspected crack cocaine. I looked at the suspected crack cocaine and determined based on my training and experience that the product CC-1 provided was not good of quality and was light on quantity. I advised CC-1 of my belief that the crack was not good stuff, to which CC-1 replied: "I just got it from my man, and it is good." I gave the suspected crack cocaine back to CC-1 and told him to get out of my car. Thereafter, I departed the area.

16. The following day, while at the Stafford County job site, CS-1 mentioned to EATMON CC-1's attempt to sell me cocaine and that I had not approved of its quality. At the time, CS-1 did not know that EATMON was the narcotics supplier for CC-1 and only knew that EATMON was CC-1's boss at the Stafford County job site. EATMON advised CS-1 that he was CC-1's source of supply and that he would sell crack cocaine to CS-1's friend, meaning me.

B. **February 4, 2020 Purchase**

17. In or around February 2020, I contacted EATMON and arranged to purchase two ounces of crack cocaine (approximately 56 grams) for $2,800.00. On or about February 4, 2020, I met EATMON in a previously agreed upon location: the Ravensworth Shopping Center parking lot in Springfield, Virginia, within the Eastern District of Virginia. Once at the location, I spoke with EATMON via the same cellular phone number CS-1 had provided for EATMON. EATMON

5

stated he was nearby and instructed me to park at a nearby 7-Eleven store in Springfield, Virginia, within the Eastern District of Virginia. EATMON instructed me that once EATMON parked his vehicle by the 7-Eleven store, he would leave the crack cocaine in the front passenger seat of his car, exit his vehicle, and go inside the 7-Eleven store. EATMON directed me to pick up the crack cocaine and leave the $2,800.00 in the front passenger seat. Once EATMON arrived at the 7-Eleven store, EATMON parked his vehicle near my undercover vehicle, and then exited his vehicle. EATMON walked into the 7-Eleven store. Thereafter, I opened the unlocked front passenger side door of EATMON's vehicle, picked up the suspected crack cocaine, and placed $2,800.00 in FCPD official funds on the front passenger seat of EATMON's vehicle. I proceeded back to my undercover vehicle and field-tested the suspected crack cocaine, which yielded a positive result for cocaine.

18. Soon after, EATMON walked over to my undercover vehicle. A short conversation ensued between EATMON and me during which I advised EATMON that CC-1 "did not do me right." EATMON replied that he was CC-1's supplier and that sometimes CC-1 will short his customers regarding the drug amounts. EATMON then told me to let him know when I wanted additional amounts of crack cocaine, and then EATMON and I departed.

19. Based on my training, experience, and knowledge of this investigation, I assessed that the crack cocaine purchased from EATMON resembled the same product that I previously attempted to purchase from CC-1 on or about January 28, 2020. My meeting with EATMON on February 4, 2020 was audio recorded. The suspected crack cocaine was submitted to the Commonwealth of Virginia, Department of Forensic Science Laboratory for testing. The laboratory results indicated that the net weight of the submission was approximately 55.27 grams of cocaine base.

## C. February 20, 2020 Purchase

20. On or about February 20, 2020, I conducted an additional undercover purchase of crack cocaine from EATMON. The deal was arranged for me to purchase four ounces (approximately 113 grams) of crack cocaine for $5,200.00 at the same location as the transaction on February 4, 2020. Prior to my arriving in the 7-Eleven parking lot, FCPD detectives observed EATMON's vehicle arrive and park in the 7-Eleven parking lot. EATMON exited his vehicle and then walked up to the 7-Eleven store, stood in front of the store, and looked around. I contacted EATMON by cellular phone and advised him that I was near the meet location. EATMON replied "ok" and confirmed he was at the location. EATMON directed me where to park in the parking lot. I complied and then walked to the driver side door of EATMON's vehicle, where EATMON was now sitting. EATMON exited his vehicle and briefly talked to me. EATMON then directed me to retrieve the crack cocaine in the front passenger side door of EATMON's vehicle, while EATMON stayed outside next to his driver's side door. I opened the front passenger side door of EATMON's vehicle and picked up approximately four ounces of suspected crack cocaine. I placed the $5,200.00 in FCPD official funds the front passenger seat of EATMON's vehicle. I then advised EATMON that I would contact him again when I wanted an additional amount of crack cocaine. EATMON replied, "The next time you want something give me some advance notice." I agreed, and EATMON departed the area in his vehicle.

21. The meeting with EATMON on February 20, 2020, was audio recorded. Law enforcement submitted the suspected crack cocaine to the Commonwealth of Virginia, Department of Forensic Science Laboratory for testing. The laboratory results indicated that the net weight of the submission contained approximately 111.59 grams of cocaine base.

### D. CS-1's Additional Conversations with Eatmon Regarding Narcotics

22. In or around February 2020, CS-1 was sitting with EATMON while parked in EATMON's vehicle at the Stafford County job site when EATMON showed CS-1 what he assessed to be approximately a half-kilogram of crack cocaine (500 grams). CS-1 told law enforcement that the crack cocaine looked like a white large round cookie and that EATMON had it inside of his yellow work knit hat. EATMON advised CS-1 that the round item was crack cocaine, and that he was going to sell it to a drug customer that day.

23. In or around March 2020, CS-1 had several other in-person conversations with EATMON at the Stafford County job site. In one conversation, EATMON told CS-1 that a shipment of cocaine would be arriving soon, but that he was waiting for approximately $65,000.00, which was currently "out in the street." EATMON told CS-1 that once his money returned to him, EATMON would be able to meet CS-1's friend (me) and sell to him. EATMON also stated during one conversation with CS-1 that he had purchased a white Mercedes Benz for CC-2 and that he had a new Chevrolet Tahoe.

24. Based on my training, experience, and knowledge of this investigation, I believe that EATMON provides cocaine on consignment to long-standing, trusted customers. I believe that EATMON was waiting for these customers to pay $65,000.00 in drug proceeds that was owed to EATMON. I also believe that once EATMON obtained the amount of money owed to him by his drug customers, EATMON planned to meet with his source of supply to obtain an additional amount of cocaine that EATMON would redistribute in and around the Eastern District of Virginia.

### E. March 2020 Interview of Cooperating Witnesses About Eatmon's DTO

25. In or around March 2020, I spoke with a Cooperating Witness ("CW-1") regarding

this investigation. Regardless of sex, I will use masculine pronouns to refer to CW-1. , CW-1 is currently facing state charges for possession with intent to distribute a Schedule I or II controlled substance, possession of a schedule I or II controlled substance, possession of a firearm while possession with intent to distribute a Schedule I or II controlled substance, possession of a firearm by a convicted felon, and possession of paraphernalia. CW-1 is providing information to law enforcement in the hopes of receiving favorable consideration in his pending criminal case. The information he has provided during this investigation has been corroborated where possible and has not been found to be false or misleading in any material respect. Further, CW-1 has provided law enforcement with information contrary to his penal interest. For these reasons, I consider CW-1 to be reliable.

26. During the interview, CW-1 provided law enforcement with information regarding EATMON's DTO, including information about EATMON, CC-1, CC-2, and CC-3. CW-1 told law enforcement that he obtained crack cocaine and powder cocaine from CC-1, EATMON, and CC-2 on numerous previous occasions.

27. CW-1 told law enforcement that, in or about the summer of 2018, CC-1 approached CW-1 while at work at Stafford County job site and referenced powder cocaine and crack cocaine. Soon thereafter, CW-1 said he started obtaining user amounts from CC-1, which amounted to approximately 1 gram of crack cocaine for $20.00. Then, CW-1 started purchasing quarter-ounce amounts (approximately 7 grams) of crack cocaine, and he eventually began selling crack cocaine for a profit.

28. Within an approximately one-month period, CW-1 said he increased the drug amounts and started purchasing between 2 ounces (approximately 56 grams) and 4 ounces (approximately 113 grams) of crack cocaine from CC-1 at a time. Thereafter, CW-1 said he started

consistently purchasing 4 ounces of cocaine (approximately 113 grams), half of which was crack cocaine, and the other half was powder cocaine, every couple of days.

29. As a result of CW-1 selling the drugs he obtained from CC-1 so quickly, CW-1 said he drew EATMON's attention. CW-1 recalled he purchased from CC-1 for approximately 2 to 5 months before meeting EATMON regarding drug transactions. In or around late summer or early winter of 2018, CW-1 said that EATMON approached him and advised CW-1 that he was CC-1's "source of supply." In addition, EATMON advised CW-1 that he would provide CW-1 with a better price on the drugs when he bought straight from him (EATMON). After the meeting with EATMON, CW-1 started purchasing 4 ounces of crack cocaine exclusively from EATMON every few days.

30. During the interview, I showed CW-1 a picture of EATMON, who CW-1 identified as "boss man" and also as "Doug." CW-1 also positively identified a picture of CC-1 during this interview. Further, when I showed CW-1 a picture of CC-2, CW-1 identified CC-2.

31. CW-1 said that there were several times when CW-1 and CC-1 met with EATMON inside EATMON's vehicle at the Stafford County job site. CW-1 said that during these meetings they would each pay EATMON what they owed him for narcotics that they had received on consignment, and then they would obtain additional amounts of cocaine on consignment.

32. CW-1 told law enforcement that when he first started buying from EATMON, CW-1 would obtain 4 ounces of crack cocaine at the job site every two to three days. CW-1 did not have a car, so he would have the crack cocaine on his person, inside his book bag. He said there were also times EATMON would drop CW-1 off at his residence, so that CW-1 could put the crack cocaine inside CW-1's residence. At some point, CW-1 said that he advised EATMON that he did

not want to have crack cocaine on his person at the job site anymore, so EATMON started driving to CW-1's residence to conduct their drug transactions.

33. Thereafter, CW-1 started purchasing 8 to 10 ounces of cocaine every 2 to 3 days. At this point, CW-1 said he was getting all "soft" (powder) cocaine and cooking it "hard" himself (into crack cocaine). CW-1 said that the most CW-1 ever purchased on one occasion from EATMON was 18 ounces (approximately one-half kilogram) of cocaine. CW-1 stated he was purchasing approximately a half kilogram to one kilogram of cocaine every month for approximately a 1-year period, concluding in or around February 2020.

34. Furthermore, CW-1 advised that he met with both EATMON and CC-2 approximately 4 or 5 times by CW-1's residence to conduct drug transactions, the last time being earlier in 2020. CW-1 explained that on several occasions EATMON and CC-2 came by CW-1's house to obtain the drug debt CW-1 owed EATMON, and then provided CW-1 with additional cocaine on consignment. CW-1 said that when CC-2 accompanied EATMON, CC-2 always drove EATMON's vehicle, and EATMON rode in the front passenger seat of the vehicle. CW-1 further explained that when EATMON and CC-2 arrived at CW-1's residence, CW-1 entered the back-passenger seat and gave CC-2 his money in a black bag. Thereafter, EATMON gave CW-1 additional cocaine. CW-1 said that EATMON used a kitchen scale, placed in between his legs, to weigh the cocaine prior to giving it to CW-1. Further, while the deal was being conducted, CC-2 drove them around the neighborhood. CW-1 observed that EATMON and CC-2 always had an additional amount of cocaine left in EATMON's vehicle after CW-1 obtained his drug amount. When the drug transaction was over, CW-1 would exit EATMON's vehicle and EATMON and CC-2 departed the area.

35. In January 2020, the Stafford County Sheriff's Office's (SCSO) Special Investigation Unit conducted two controlled buys from CW-1 at CW-1's residence.

36. Then, on January 31, 2020, CW-1 overdosed at his residence on suspected heroin, fentanyl, or other Schedule I or II substances. Based on CW-1's information, the location of his overdose was the same residence that EATMON would visit to pick up money and drop off narcotics. SCSO deputies responded to the overdose and, after CW-1 was stabilized, seized from CW-1's person a quantity of crack cocaine, several syringes, and cash. Near where CW-1 was found, officers noticed empty baggies consistent with the packaging in which drugs are often sold. An AR-style semi-automatic firearm was also nearby in plain view on a table.

37. The next day, February 1, 2020, officers executed a search warrant at CW-1's residence based on the two controlled buys and CW-1's overdose. Law enforcement observed and seized a large quantity of suspected crack cocaine from the bedroom CW-1 shares with his girlfriend.

38. As a result of this evidence, CW-1 was charged and arrested for possession with intent to distribute a Schedule I or II controlled substance, possession of a schedule I or II controlled substance, possession of a firearm while possession with intent to distribute a Schedule I or II controlled substance, possession of a firearm by a convicted felon, and possession of paraphernalia. CW-1 is currently incarcerated on these charges.

39. When I spoke to CW-1 at the jail, he stated that all the crack cocaine at his house came from EATMON, whom he called "Boss Man". CW-1 advised that he paid EATMON in cash and using a cellular phone application called Cash App. CW-1 gave me consent to search his phone.

40. In CW-1's Cash App, there is a payment and transaction history. A photo of EATMON's face appears on that history. EATMON's Cash App account is under the name "Doug E $ChekCutter." The transaction history shows that CW-1 paid EATMON $28,500.00 in 51 different payments between August 23, 2019 and January 30, 2020. The payment history is as follows:

| Date of Transaction | Amount | Date of Transaction | Amount | Date of Transaction | Amount |
|---|---|---|---|---|---|
| August 23, 2019 | $418.00 | November 1, 2019 | $200.00 | December 31, 2019 | $3,780.00 |
| August 29, 2019 | $750.00 | November 4, 2019 | $600.00 | January 2, 2020 | $250.00 |
| August 30, 2019 | $100.00 | November 4, 2019 | $15.00 | January 11, 2020 | $725.00 |
| September 2, 2019 | $200.00 | November 6, 2019 | $500.00 | January 24, 2020 | $1,000.00 |
| September 2, 2019 | $60.00 | November 12, 2019 | $230.00 | January 24, 2020 | $770.00 |
| September 7, 2019 | $340.00 | November 18, 2019 | $500.00 | January 30, 2020 | $800.00 |
| September 10, 2019 | $245.00 | November 22, 2019 | $500.00 | | |
| September 13, 2019 | $65.00 | November 25, 2019 | $500.00 | **TOTAL:** | **$28,501.00** |
| September 13, 2019 | $725.00 | November 25, 2019 | $1,000.00 | | |
| September 13, 2019 | $700.00 | November 25, 2019 | $100.00 | | |
| September 17, 2019 | $648.00 | November 28, 2019 | $130.00 | | |
| September 18, 2019 | $300.00 | November 30, 2019 | $350.00 | | |
| September 19, 2019 | $450.00 | November 30, 2019 | $250.00 | | |
| September 21, 2019 | $675.00 | December 1, 2019 | $550.00 | | |
| September 30, 2019 | $50.00 | December 5, 2019 | $350.00 | | |
| October 3, 2019 | $310.00 | December 7, 2019 | $1,575.00 | | |
| October 4, 2019 | $630.00 | December 13, 2019 | $300.00 | | |
| October 7, 2019 | $720.00 | December 14, 2019 | $950.00 | | |
| October 9, 2019 | $1,050.00 | December 16, 2019 | $700.00 | | |
| October 11, 2019 | $30.00 | December 24, 2019 | $360.00 | | |
| October 17, 2019 | $325.00 | December 26, 2019 | $1,000.00 | | |
| October 19, 2019 | $350.00 | December 28, 2019 | $1,375.00 | | |

41. The Cash App transaction history also included a cancelled payment of $975.00 on December 13, 2019 and several messages. One message, sent with the December 28, 2019 payment of $1,375.00, stated: "how you like meNOW gol…" Another message, sent with the December 31, 2019 payment of $3,780.00, stated: "strippers." CW-1 told me that he would use the message "strippers" when he was paying EATMON for a drug debt.

13

42. In addition to these payments, on three different occasions, EATMON asked CW-1 to send drug-debt payments to Asia Tai Robinson—Cash App username of "$Asia Tai"—to cover his child support. Those payments included:

| Date of Transaction | Amount |
|---|---|
| September 24, 2019 | $831.00 |
| September 26, 2019 | $640.00 |
| October 31, 2019 | $400 |

43. Moreover, CW-1's phone has three phone numbers listed for EATMON, who is listed as "BOSS." One of the three phone numbers is the same phone number that I used to contact EATMON to conduct my controlled purchases with him. One of the other numbers was a phone number that CS-1 had listed for EATMON.

### F. November 13, 2020 Conversation between CS-1 and Eatmon

44. On November 13, 2020, under law enforcement direction, CS-1 contacted EATMON via cellular phone. CS-1 stated to EATMON, "I'm going to need something, and I'm working with $1,400.00". EATMON replied, "If I come home today, I got you." EATMON then stated to CS-1, "You know [J.], right? [J.] got half my stuff."

45. I am aware that during this investigation CS-1 contacted EATMON under my direction and requested an ounce (approximately 28 grams) of cocaine base (crack cocaine) from EATMON. CS-1 advised EATMON that he had only $1,400.00. EATMON advised CS-1 that he would sell the cocaine to CS-1 if he was going to be in the area. In addition, EATMON advised CS-1 that [J.] had a larger quantity of EATMON's cocaine. I have identified [J.], as J.M., a drug customer of EATMON's DTO. Furthermore, I am aware that J.M. has obtained more than two kilograms of cocaine from EATMON.

## G. CS-1's February 2021 Information Regarding Eatmon

46. In or around February 2021, CS-1 advised me that EATMON had a long line of people waiting to obtain cocaine from EATMON at a construction site located in the Eastern District of Virginia. I am aware that EATMON's new construction assignment was located near Interstate 64 in Williamsburg, Virginia. I am aware that EATMON stays in the area of Newport News, Virginia during the week, and on weekends EATMON returns to his residence and drug-stash location in Hyattsville, Maryland.

## CONCLUSION

46. Based on the facts outlined above, there is probable cause to believe that, from in and around late 2018 through on or about March 2021, within the Eastern District of Virginia, DOUGLAS CHARLES EATMON knowingly and intentionally conspired to distribute 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance.

*Edgar Gay*
Edgar Gay
Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on April 16, 2021.

_____ /s/ _____
Ivan D. Davis
United States Magistrate Judge

15